UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **JOHNY MAYNOR,** *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action Number |
| ) | **5:01-cv-851-AKK** |
| **MORGAN COUNTY, AL,** *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

In 2001, the Plaintiffs, a class of pretrial detainees confined in the Morgan County Jail ("the Jail"), sued Morgan County and a number of county, state, and Jail officials, alleging inhumane treatment and conditions of confinement. The parties settled their dispute and agreed to a consent decree requiring the Defendants to make a number of reforms. Presently before the court is the Defendants' motion to terminate the consent decree, doc. 173,[1] pursuant to the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626.

The PLRA, which Congress passed in 1996, "altered the landscape of prison reform litigation." *Cason v. Seckinger*, 231 F.3d 777, 779 (11th Cir. 2000).

---

[1] Several other motions are also before the court. The Plaintiffs' motion for leave to file sur-reply, doc. 212, is due to be granted. Class member John Kister's three motions relating to the October 2017 evidentiary hearing, docs. 192, 193, 194, are moot. Kister also filed a motion seeking transcripts of certain hearings, doc. 216. However, because Kister has not prepaid the cost of these transcripts, and because even indigent detainees do not have a right to receive transcripts at no cost, *see United States v. Newsome*, 257 F. Supp. 201, 203 (N.D. Ga. 1966), the motion is due to be denied.

1

Relevant here, the PLRA "limits a court's authority to continue to enforce previously entered prospective relief in prison litigation reform cases." *Id.* at 780. A party may seek to terminate a consent decree after a certain timespan has elapsed. *Id.* (citing 18 U.S.C. §§ 3626(b)(1)(A), 3626(b)(2)). The court must grant the motion unless it "determines that the relief remains necessary to 'correct a current and ongoing violation of [federal rights].'" *Id.* at 780 (quoting 18 U.S.C. § 3626(b)(3)). The party opposing the termination of prospective relief has the burden of proving a current and ongoing constitutional violation. *Id.* at 782-83. And, "[e]ven where there is a current and ongoing violation, prospective relief must be terminated unless the district court makes written findings on the record that the relief extends no further than necessary to correct the violation, that the relief is narrowly drawn, and that the relief is the least intrusive means to correct the violation," the so-called need-narrowness-intrusiveness requirements. *Id.* (citing 18 U.S.C. § 3626(b)(3)).

In their motion, which is fully briefed, docs. 199, 210, 211, 212-1, and ripe for review, the Defendants argue that the consent decree's remaining provisions must be terminated because there are no current and ongoing violations at the Jail, or alternatively, that these provisions do not satisfy the need-narrowness-intrusiveness requirements. Although the Plaintiffs oppose the motion, they generally agree with the Defendants that the majority of the consent decree's terms

are subject to termination. *See* docs. 168, 169, 186, 189, 198, 200. Instead, the Plaintiffs challenge only the termination of Paragraphs 16 and 18,[2] arguing that the Jail's current conditions related to mental health treatment warrant these provisions' extension. While the court is concerned by the evidence of inadequate mental health care at the Jail, the Plaintiffs have failed to satisfy their burden of showing that the Defendants were deliberately indifferent to the risks of this inadequate care. Therefore, the court has no basis to find that the Defendants' conduct constitutes a current and ongoing violation, and, accordingly, the motion to terminate is due to be granted.

---

[2] Paragraph 16 provides that

> If, during intake screening, an inmate states that he or she is on medication for a chronic or acute illness and the medication cannot be verified within 24 hours of intake, then, within the next 24 hours, the inmate will be seen by a physician who shall continue the inmate's prescriptions, or in the alternative, order other treatment for the inmate consistent with the community standard of care for the inmate's condition. The inmate shall receive the first dose of the medication prescribed by this physician within the second 24-hour period (in other words, within 48 hours of intake). The physician's decision to continue, discontinue, or modify the inmate's treatment, and the reasons for this decision, shall be documented in the inmate's medical record.

Paragraph 18 provides that

> Inmates who indicate through the intake screening or who appear to be suffering from serious mental illness, including suicidal tendencies, shall be seen promptly by a qualified mental health specialist for diagnosis and appropriate and ongoing treatment. County Defendants shall develop a written plan which ensures that inmates with mental illness are seen promptly by qualified mental health specialists.

Doc. 45 at 8.

## I. ANALYSIS

The Supreme Court has developed a two-part analysis governing challenges to the constitutionality of conditions of confinement, consisting of an "objective test" and a "subjective test." *Chandler v. Crosby,* 379 F.3d 1288-89 (11th Cir. 2004). Basically, the court must ascertain whether a current constitutional violation has caused or threatens to cause serious harm to a detainee with serious medical needs (the objective test), and establish a defendant's deliberate indifference (the subjective test) to find a current and ongoing violation. The court will begin its analysis by determining what timeframe to use in assessing the currentness of the alleged violations, before turning to the objective test and subjective test components. Finally, the court will address the need-narrowness-intrusiveness requirements.

### A. What is the Proper Timeframe for Determining the Currentness of the Alleged Violations

The parties disagree on the time period the court should consider in ascertaining whether current and ongoing violations exist at the Jail. Basically, the Plaintiffs contend that the proper period is the date when the Defendants filed their motion to terminate, June 27, 2017, and the Defendants counter that it is the date of the evidentiary hearing, October 4, 2017.

A current and ongoing violation "is a violation that exists at the time the district court conducts the § 3626(b)(3) inquiry" into whether it should terminate

the prospective relief, "not a potential future violation." *Cason*, 231 F.3d at 784. *Cason*, however, offers no additional guidance. Moreover, the parties have not cited, and the court has not found, any Eleventh Circuit decision squarely addressing the question of precisely when the § 3626(b)(3) inquiry occurs. The court notes, however, that the Fifth Circuit, in interpreting *Cason*, has held that "a court must look at the conditions in the jail *at the time termination is sought*, not at conditions that existed in the past or at conditions that may possibly occur in the future[.]" *Castillo v. Cameron Cty., Tex.*, 238 F.3d 339, 353 (5th Cir. 2001) (emphasis added). The court finds the Fifth Circuit's interpretation persuasive.

Requiring the Plaintiffs to present evidence on Jail conditions as of the date of the evidentiary hearing, as the Defendants propose, would pose an immense, and possibly insurmountable, logistical burden. For example, no expert witness is capable of reasonably reviewing the evidence she needs to form her opinions regarding a jail's conditions as of the very day she is to testify. In fact, if the Defendants' proposition is taken to its logical extreme, even detainees would be unable to testify as to the conditions of their confinement, because their presence at the evidentiary hearing would necessarily mean that they lack personal knowledge of the jail's conditions at the time of the hearing. Put simply, the Defendants' interpretation would frustrate the very purpose of the evidentiary hearing that *Cason* mandates. Accordingly, the court will consider the Jail's conditions on the

5

date the Defendants filed the motion to terminate to determine whether a current and ongoing violation exists.

**B. Whether the Plaintiffs Satisfy the Objective Test**

The objective test of the inquiry of whether a current and ongoing violation exists requires an initial showing that detainees have "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[A] serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994) (citations and internal quotation marks omitted), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002). This issue is not in contention, as the Defendants do not dispute that serious mental illnesses are serious medical needs, *see* docs. 199, 211, and the Plaintiffs' expert witness, Dr. Kelly Coffman, testified that many Plaintiffs have serious mental illnesses. Therefore, the Plaintiffs have satisfied their burden of showing a serious medical need.

The Plaintiffs must next show under the objective test that a detainee with a serious medical need has suffered serious harm or is "incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). This inquiry requires the court to ascertain whether inadequacies in the Jail's provision of mental health care either seriously harmed the Plaintiffs or

created a substantial risk of serious harm to the Plaintiffs. The Plaintiffs concede the first point through Dr. Coffman's testimony that no evidence shows that any Plaintiff suffered serious harm as a result of the Defendants' conduct. This concession is not fatal to the showing of a substantial risk of serious harm, however, because the law recognizes that "a remedy for unsafe conditions need not await a tragic event." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Rather, the Constitution "protects against future harms to inmates" even when the harm "might not affect all of those exposed" to a risk, and even when the harm might not manifest immediately. *Id.* Thus, conditions posing an unreasonable risk of serious damage to detainees' future health can satisfy the objective test. *Id* at 35.

In other words, the Plaintiffs need to show only "that they have been subjected to the harmful policies and practices at issue, not (necessarily) that they have already been harmed by these policies and practices." *Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1123 (M.D. Ala. 2016). Moreover, multiple policies or practices that combine to deprive a detainee of a "single, identifiable human need," such as mental health care, can constitute a substantial risk of serious harm. *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) (citing *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)); *see Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575-76 (11th Cir. 1985) (recognizing "totality of conditions" approach in prison conditions cases). More specifically, here, the Plaintiffs contend that four current and ongoing practices,

taken together, create a substantial risk of serious harm.[3] The court addresses each alleged practice in turn.

*1. Insufficient Psychiatric Staffing*

Dr. Coffman testified that, although the Jail has 125 mental health patients, the Jail's psychiatrist only visited an average of slightly more than five hours each month from June to September 2017, and spent an average of six minutes with each patient he examined during his visit. *See* doc. 202-28. The Plaintiffs contend that this meant that only twenty-seven patients received psychiatric treatment each month on average, resulting in extensive wait times and a one to six month lag between a detainee placing a sick call and receiving treatment. *See id.* In her testimony at the hearing, Dr. Coffman described the Jail's psychiatric staffing as wholly inadequate, testifying that adequate care would entail that the psychiatrist see a minimum of forty detainees each month based on the Jail's current mental health caseload. Dr. Coffman added that the length of the wait and the resulting uncertainty of when a detainee would receive treatment could exacerbate feelings of hopelessness and helplessness, potentially leading to severe consequences such as harm to self or others. Additionally, because detainees are unable to receive

---

[3] The Plaintiffs identify these practices as: "(1) the failure to ensure adequate psychiatric staffing levels, resulting in long delays in the provision of mental health care; (2) the failure to routinely refer those who report or display signs or symptoms of serious mental illness at intake for prompt psychiatric assessment and treatment; (3) the abrupt withdrawal of psychotropic medication from class members at intake without any individualized determination by a psychiatrist that such withdrawal is medically necessary; and (4) the failure to schedule follow-up appointments with a psychiatrist after class members are prescribed new medications." Doc. 210 at 16.

psychiatric medication before seeing a psychiatrist, they are at risk of the recurrence of mental health symptoms previously treated by their medication, the exacerbation of such symptoms, and the withdrawal symptoms of their medications, including the potentially fatal ones from benzodiazepines. Based on her demeanor, knowledge, and expertise, the court finds Dr. Coffman credible and accepts her testimony. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (U.S. 1985) ("When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said") (citing *Wainwright v. Witt*, 469 U.S. 412 (1985)). Dr. Coffman's testimony supports a finding that the Jail's low level of psychiatric staffing, taken together with its other practices, creates a substantial risk of serious harm.

*2. Failure to Refer Patients at Intake*

Dr. Coffman testified also that the Jail's post-intake referral process "essentially does not exist." She reached this conclusion based on medical records showing that the Jail did not directly refer some detainees for psychiatric treatment despite identifying them at intake as displaying symptoms of serious mental illnesses. This failure meant that these detainees could only receive treatment through the standard sick call procedure, which requires a co-pay before a detainee

9

can speak with a nurse who then determines whether to place the detainee on the wait list to see a psychiatrist. In addition to criticizing the co-pay, Dr. Coffman added that requiring detainees with mental illnesses to self-refer for treatment places them at risk by creating unnecessary obstacles to treatment. According to Dr. Coffman, people with mental illnesses are often cautious about seeking treatment or do not believe they need treatment. These tendencies are apparently exacerbated in the jail setting, due to detainees' fears for their safety and the potential of victimization. As a result, Dr. Coffman theorized that detainees may either avoid self-referring until they can no longer manage their symptoms, resulting in the detainee requiring higher doses of medication and a longer period to return to a baseline level of function than if she had received a referral at intake, or avoid self-referring altogether. The court finds Dr. Coffman's testimony credible. The "[f]ailure to identify those who need mental-health services denies them access to necessary treatment, creating a substantial risk of harm to those who remain unidentified." *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1201 (M.D. Ala. 2017) (citing *LaMarca v. Turner*, 995 F.2d 1526, 1544 (11th Cir. 1993)). While here the Jail did not fail to identify detainees who required psychiatric care, its failure to provide referrals had the same effect of denying those individuals access to necessary treatment. Therefore, the evidence supports a finding that the Jail's

failure to refer detainees displaying signs of serious mental illness at intake, taken together with its other practices, creates a substantial risk of serious harm.

   *3. Discontinuation of Medication*

The Plaintiffs also criticize the Jail's practice of discontinuing at intake the psychiatric medications of detainees who test positive for illegal drugs[4] or the prescriptions of those taking prohibited medications, such as benzodiazepines or seroquel. Once the medications are discontinued, the detainee has to wait until she receives a new prescription from the Jail's psychiatrist. The Jail rigidly enforces these rules at intake, without any opportunity for a psychiatrist to deviate based on medical necessity. Dr. Coffman testified that abruptly discontinuing medications can exacerbate mental health symptoms or cause symptoms previously treated by the medication to recur, potentially causing a detainee to pose a risk of harm to herself or others. While Dr. Coffman noted that benzodiazepines and seroquel should not be used frequently in a jail setting due to the potential for abuse, she testified that limited use was appropriate in some circumstances.

The Plaintiffs also presented evidence about the risk of the withdrawal symptoms of psychiatric medications. In the case of benzodiazepines, these include life-threatening fluctuations in blood pressure and heart rate that can cause seizures or death. The Plaintiffs added that these risks are exacerbated by the Jail's

---

[4] Detainees who test positive for controlled substances are prohibited from receiving any psychiatric medication for thirty days.

inadequate staffing and the resulting long wait before detainees can receive a new prescription or treatment for withdrawal symptoms. Consequently, the Plaintiffs argue that the Jail should allow psychiatrists to determine at intake whether continuing a detainee's medications is medically necessary rather than applying a rigid blanket rule, and that, rather than abruptly discontinuing medications, the Jail should taper dosages downward over a period of time and monitor the effects of reduced dosages. This evidence supports a finding that the Jail's policy of abruptly discontinuing detainees' medications, together with its other practices, creates a substantial risk of serious harm. *See Graves v. Arpaio*, No. CV-77-0479-PHX-NVW, 2008 WL 4699770, at *32 (D. Ariz. Oct. 22, 2008) ("Providing pretrial detainees' prescription medications without interruption is essential to constitutionally adequate medical care . . . Lapses in medication for certain medical conditions . . . can be life threatening even if the lapse is only a few days").

*4. Failure to Schedule Follow-up Appointments*

Finally, the Plaintiffs challenge the Jail's failure to automatically schedule follow-up psychiatric appointments to evaluate the effects of newly prescribed medications. While any Jail employee is free to make a psychiatric referral for a detainee, the Jail has no mechanism for automatic referrals. The only avenue for detainees who do not receive referrals to pursue follow-up care is through the sick call process. The Plaintiffs maintain that the failure to provide referrals for follow-

12

up care each time a detainee is prescribed a new psychiatric medication carries all the previously discussed risks of requiring self-referral, including the possibility of detainees going without follow-up treatment entirely. This evidence supports a finding that the Jail's lack of automatic referrals, taken together with its other practices, creates a substantial risk of serious harm.

To sum up, Dr. Coffman's testimony, which the court finds credible, makes clear that the inadequacies in the Jail's provision of mental health care subject detainees to a substantial risk of significant harm. Therefore, the Plaintiffs have satisfied the objective test by showing a serious medical need and that the Jail's conditions pose a substantial risk of serious harm. This is only the first step in the inquiry, however.

### C. Whether the Plaintiffs Satisfy the Subjective Test

The court turns next to the second part of the inquiry—the subjective test. This entails showing that an official acted with deliberate indifference to a harm or risk of harm: that is, the official must have "know[n] of and disregard[ed] an excessive risk to inmate health or safety[.]" *Farmer*, 511 U.S. at 837. In defining the deliberate indifference standard, the Court stated:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.[5] "Negligence does not suffice to satisfy this standard," *Wilson v. Seiter*, 501 U.S. 294, 305 (1991), but a detainee need not show that the official acted with "the very purpose of causing harm or with knowledge that harm [would] result," *Farmer*, 511 U.S. at 835. In sum, the subjective test has three components: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than negligence." *Farrow v. West,* 320 F.3d 1235, 1245 (11th Cir. 2003). A failure to make any one of these showings means that the Plaintiffs have failed to satisfy the subjective test. *See id.* For the reasons stated below, the court finds that the Plaintiffs have failed to satisfy all three components.

*1. Did Jail Officials have Subjective Knowledge of a Risk of Serious Harm?*

To establish deliberate indifference, the Plaintiffs must first show that the Defendants had subjective knowledge of the harm or risk of harm. *Thomas v. Bryant*, 614 F.3d 1288, 1312 (11th Cir. 2010). Subjective awareness of a risk of harm can be determined based on circumstantial evidence, including "the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. In other words, if a particular risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have

---

[5] For pretrial detainees, deliberate indifference claims are governed by the Fourteenth Amendment, not the Eighth Amendment. *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996) (citations omitted). However, courts apply the same standard in analyzing such claims. *Id.*

known' about it," such evidence permits a trier of fact to conclude that the officials had actual knowledge of the risk. *Id.* at 842-43 (internal citation omitted).

The Defendants contend "there was no evidence of a serious mental health need that posed a substantial risk of serious harm[.]" Doc. 211 at 8. The Plaintiffs dispute that there was no serious risk of harm, and, as discussed above, the court agrees. However, the Plaintiffs have not presented evidence demonstrating the existence of facts from which the Defendants could have reasonably inferred the existence of these risks, or that the Defendants actually made this inference. The record also does not support a finding that the risk was obvious or that the Defendants must have known about it. *Compare Braggs*, 257 F. Supp. 3d at 1252-55 (finding subjective knowledge of risk where, among other things, corrections officials testified that system-wide conditions created substantial risk of suicide, multiple sources informed the department that staffing shortages undermined a health care contractor's ability to provide care, and medical staff had made oral and written communications to corrections officials concerning inadequate policies). Accordingly, based on this record, the Plaintiffs have failed to establish that the Defendants had subjective knowledge of the risks to the detainees.

*2. Did Jail Officials Disregard the Risk*

The next step in the inquiry is whether the Defendants disregarded an excessive risk to detainees' health or safety. *Farmer*, 511 U.S. at 837. Disregard of

a risk of harm may consist of "failing to provide care, delaying care, or providing grossly inadequate care" when doing so causes a detainee to needlessly suffer pain resulting from her illness. *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999). Put differently, the Plaintiffs can satisfy this prong if a Defendant with subjective awareness of a serious need provided "an objectively insufficient response to that need." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). In some circumstances, a defendant's disregard of a known risk is quite obvious. For example, the defendant might "simply refuse[ ] to provide" medical care known to be necessary. *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985). If a defendant provides some medical care, the Constitution does not require that the care be "perfect" or the "best obtainable." *Harris v. Thigpen*, 941 F.2d 1495, 1510 (11th Cir. 1991). Nonetheless, a defendant's disregard of the risk can still be found if he "delay[s] the treatment," provides "grossly inadequate care," chooses "an easier but less efficacious course of treatment," or provides "medical care which is so cursory as to amount to no treatment at all." *McElligott*, 182 F.3d at 1255 (collecting cases).

"[T]he quality of psychiatric care can be so substantial a deviation from accepted standards as to evidence deliberate indifference[.]" *Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir. 1996) (citing *Greason v. Kemp*, 891 F.2d 829, 835 (11th Cir. 1990)). "In institutional level challenges to prison health care . . .

systemic deficiencies can provide the basis for a finding of deliberate indifference. A series of incidents closely related in time may disclose a pattern of conduct amounting to deliberate indifference. Repeated examples of delayed or denied medical care may indicate a deliberate indifference by prison authorities to the suffering that results." *Rogers v. Evans*, 792 F.2d 1052, 1058-59 (11th Cir. 1986) (citing *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977); *Bishop v. Stoneman*, 508 F.2d 1224 (2d Cir. 1974)).

While the court agrees with the Plaintiffs that a substantial risk exists, the Plaintiffs have not provided evidence supporting a finding that the Defendants disregarded that risk. The record also does not support a finding that the Jail's provision of mental health care was so substantial a deviation from accepted standards as to evidence deliberate indifference, or that the Jail's mental health care caseload or any of its other policies are sufficient evidence of a pattern of conduct amounting to deliberate indifference. *Compare Braggs*, 257 F. Supp. 3d at 1255-62 (finding disregard where corrections officials had notice of harm, but did not respond reasonably to identified issues for several years and failed to exercise meaningful oversight of mental health care). Thus, even if the Defendants had subjective knowledge of the risks to the detainees, the Plaintiffs have not shown that the Defendants disregarded those risks.

*3. Did Jail Officials Engage in Conduct that is More Blameworthy than Negligence*

Finally, to establish deliberate indifference, the Plaintiffs must show that the Defendants' response to a known risk is more blameworthy than "mere negligence." *Farmer*, 511 U.S. at 835 (citing *Estelle*, 429 U.S. at 106). In other words, the Defendants must have disregarded the risk with "more than ordinary lack of due care for the prisoner's interests or safety." *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). However, while an "inadvertent failure" to provide adequate medical care or even medical malpractice does not satisfy the deliberate indifference standard, *Estelle*, 429 U.S. at 105-06, repeated examples of negligent conduct support an inference of systemic disregard for the risk of harm facing detainees with mental illnesses, *see Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980).

The Plaintiffs cannot make the requisite showing because even their expert testified that she was not aware of any medical malpractice by Jail personnel. Obviously, while "[s]imple medical malpractice certainly does not rise to the level of a constitutional violation," *Waldrop v. Evans*, 871 F.3d 1030, 1035 (11th Cir. 1988), the absence of negligence belies a finding that the Defendants engaged in conduct that is more blameworthy than "mere negligence." Thus, because the Plaintiffs bear the burden of proof on this issue, *see Cason*, 231 F.3d at 782-83, and because they have not produced any other evidence showing that the

Defendants acted by conduct more blameworthy than negligence, they cannot satisfy the subjective test, *see Ramos*, 639 F.2d at 575. Accordingly, the Defendants' motion is due to be granted.

**D. Whether the Plaintiffs Satisfy the Need-Narrowness-Intrusiveness Requirements**

Although the court does not need to reach this step, it notes that "[e]ven where there is a current and ongoing violation, prospective relief must be terminated" unless the relief satisfies the need-narrowness-intrusiveness requirements. *Cason*, 231 F.3d at 784 (citing 18 U.S.C. § 3626(b)(3)). "The court must make new findings about whether the relief currently complies with the need-narrowness-intrusiveness requirements, given the nature of the current violations. It is not enough under § 3626(b)(3) that the orders, when entered, were sufficiently narrow considering the violations that existed at that time." *Id.* at 784-85. Put differently, even if the Plaintiffs had satisfied the subjective test, to successfully defeat the motion to terminate, the Plaintiffs would need to satisfy the need-narrowness-intrusiveness requirements. The Plaintiffs are certainly correct that Paragraphs 16 and 18 of the consent decree squarely and directly address the inadequacies they have identified in the Jail's provision of mental health care.[6]

---

[6] Specifically, Paragraph 18's requirement that detainees appearing to suffer from mental illness at intake receive prompt medical attention addresses the Jail's failure to provide psychiatric referrals to detainees who appear mentally ill at intake, while Paragraph 16's requirement that detainees whose prescriptions cannot be verified within twenty-four hours of intake receive medical attention to either continue those prescriptions or order other treatment addresses the

Still, other than asserting that "[t]hese provisions do not constrain Defendants in any ways unnecessary to remedying these violations, and the PLRA therefore permits their retention," doc. 210 at 23, the Plaintiffs failed to present any evidence as to the narrowness and minimal intrusiveness of these provisions. Their failure to provide such evidence dooms their position because they bear the burden of proof on these issues. *See Cason*, 231 F.3d at 782-83.

## II. CONCLUSION AND ORDER

For the reasons stated above—in particular, because the Plaintiffs failed to satisfy the components of the subjective tests and the need-narrowness-intrusiveness requirements—the Defendants' motion to terminate the consent decree, doc. 173, is **GRANTED**.

The Plaintiffs' Motion for Leave to File Sur-Reply, doc. 212, is **GRANTED**. John Kister's motions, docs. 192, 193, 194, 216, are **DENIED**.

**DONE** the 31st day of August, 2018.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

---

flaws in the Jail's intake process and the practice of discontinuing medications based on positive drug tests or the nature of the medications. *See* doc. 45 at 8.